**FROG, INC., Appellant,**

v.

**DUTCH INNS OF AMERICA, INC., Appellee.**

No. 84–673.

District of Columbia Court of Appeals.

Argued Jan. 22, 1985.

Decided Feb. 28, 1985.

Stephen L. Bluestone, Washington, D.C., for appellant. William C. Hansen, Silver Spring, Md., also entered an appearance for appellant.

John Ellsworth Stein, Washington, D.C., with whom Jennifer Crowe, Roger A. Klein, and Dennis M. Hughes, Washington, D.C., were on the brief, for appellee.

Before NEWMAN, FERREN, and TERRY, Associate Judges.

TERRY, Associate Judge:

In this landlord-and-tenant proceeding, the tenant appeals from an order awarding the landlord possession of the leased premises. The trial court found that the tenant had breached four separate provisions of the lease. The tenant argues that these findings are unsupported by the evidence and are also based on an erroneous construction of the lease. Moreover, the tenant maintains that even if the court's findings were correct, they do not justify the forfeiture of the premises. We disagree and affirm.

I

In 1974 the landlord, Dutch Inns of America, Inc., entered into a fifteen-year lease agreement with the tenant, Frog, Inc., under which the tenant would operate a restaurant on the ground floor of a hotel in Georgetown owned and operated by the landlord. In 1980 Mr. and Mrs. Arthur Dalbashian purchased all the shares in Frog, Inc., from the original shareholders and began to operate the restaurant, which they renamed "Peppino's." [1]

Peppino's was run for the next few years without incident. In January 1984, however, Mr. Dalbashian [2] received a letter from the landlord, dated January 25, notifying him that his rent was overdue and giving him seven days to pay it. [3] Fourteen days later the tenant paid a portion of the

---

1. The restaurant had previously been called "La Grenouille" (the French word for frog).

2. Mr. Dalbashian operated Peppino's by himself after the death of his wife in November 1983.

3. The letter (Plaintiff's Exhibit No. 3) stated that the tenant had failed to pay "overage" rent based on gross sales for the third and fourth quarters of 1983 and also the base rent for January 1984.

rent due, but not all of it. Consequently, on February 10 the landlord sent another letter listing several breaches of the lease by the tenant and directing that they be cured within seven days.[4]

On February 23, because the tenant had made no effort to rectify matters, the landlord filed a complaint for possession in the Landlord and Tenant Branch of the Superior Court.[5] After a trial the court awarded the landlord possession of the premises. The court expressly found (1) that there was "a good deal" of solicitation by prostitutes in Peppino's, which had a "deleterious effect" on the ability of the hotel to attract some corporate clients, in contravention of paragraph 9A of the lease; (2) that the tenant had failed to provide the landlord with a certified statement of its gross sales in violation of paragraphs 2A (v) and (vi) of the lease, and (3) that the tenant had failed to give the landlord proof that it carried the insurance required by paragraph 19A of the lease.[6]

The tenant contends that the trial court's findings are grounded in an erroneous interpretation of the lease and also that they are unsupported by the evidence. We hold, however, that the court's construction of the lease is correct and that its findings are amply supported by the evidence.

## II

The court found that there was "a good deal" of solicitation of prostitution occurring in Peppino's and that it had a "deleterious effect" on the hotel's business. It then ruled that the tenant had violated the lease by allowing such activity to take place in the restaurant.

The court's finding with regard to the prostitution is fully supported by the testimony of several witnesses. For example, the hotel manager, Louis Weinkle, testified that on several occasions while working in the lobby of the hotel, one floor above the restaurant, he had seen prostitutes enter the hotel, go down into the restaurant, and then return later with their customers:

> There would ... be instances where these women would come in that appear[ed] to be prostitutes, that were not hotel guests, asking where the restaurant was, where it was located, and would go directly down, and some of these same people would later come back up wanting to get a room with someone else's I.D., which we would refuse to rent to these people, to these girls.

Mr. Weinkle remarked that he saw some of the prostitutes so often that he began to recognize them by sight. He also recounted one instance in which he saw a prostitute enter the hotel lobby and get into an argument with a restaurant patron which was "just short of a fist-fight." This incident took place at a time when a guest was checking into the hotel. "[T]hat similar type of behavior happened on many occa-

---

4. This letter (Plaintiff's Exhibit No. 6) stated that the tenant had failed (1) to pay the base rent for January and February of 1984 as required by paragraphs 2A (i) and (ii) of the lease, (2) to provide a certified statement of Peppino's gross sales for 1983 pursuant to paragraphs 2A (v) and (vi), (3) to furnish evidence that Peppino's maintained the insurance policies required by paragraphs 6 and 19A of the lease, and (4) to operate Peppino's within the "high standard" required by paragraph 9A of the lease, in that it had knowingly permitted prostitutes to solicit business on the premises and had served alcohol to patrons who were already drunk. Finally, the letter said that if the breaches were not cured within seven days, the landlord would take possession of the premises pursuant to paragraph 27 of the lease.

5. As grounds for the action, the complaint alleged: "Failure to provide certified statement of gross sales for quarters ending 9/30/83 and [12/31/83]; failure to operate dining room and services at standards in accordance with the Lease; failure to keep demised premises in good repair and condition in accordance with Lease; failure to pay January rent in timely manner after demand therefor." It did not mention anything about proof of insurance coverage.

6. The court also made two findings in favor of the tenant. It found that the restaurant was kept in good condition, and that both the January and the February rent had been fully paid by February 10, the date of the second letter.

sions," Mr. Weinkle said, so that "people checking in just changed their minds and want[ed] to leave the hotel."

Further evidence of the prostitutes' activities was provided by Mohammed Amir Ali, the night auditor of the hotel. He testified that prostitutes would often come in through the hotel lobby after 11:00 p.m. and proceed downstairs to the restaurant. Sometimes as many as seven prostitutes would enter the hotel and go down into the restaurant on a given night. Like Mr. Weinkle, Mr. Ali testified that he came to recognize several of the prostitutes who passed through the lobby on a regular basis.

Norman Wilkinson, the hotel's assistant manager, said that on one occasion he saw a prostitute attempting to solicit hotel patrons in the lobby. He testified that he approached her and "told her if she was going to do that, she'd have to leave the hotel. So she went downstairs into the restaurant."

Other hotel employees testified about Peppino's reputation in the community as a "rough place" where prostitutes "hang and do their business, and the people are usually drinkers, heavy drinkers...." Their testimony was based in part on statements of former and current hotel patrons who had told them of the restaurant's reputation. There was also evidence that some regular corporate clients had ceased to do business with the hotel because of the activities in the restaurant. A representative of Lockheed, for example, told the hotel's account executive "that they will not book there because their executives really don't want to rub elbows with the people that come up from the restaurant."

To counter all of this evidence, the tenant offered the testimony of Mr. Dalbashian, who professed ignorance of the prostitutes' activities. Two other witnesses also stated that they frequented the restaurant with their families, and that they had never been propositioned by prostitutes.

On the basis of all of the evidence, the court found:

[T]he restaurant is a place where prostitutes go pick up customers, and there's a good deal of solicitation at the restaurant, and that has [a] deleterious effect on the business of the hotel in being able to book some corporate clients. The testimony of defense witnesses as to the nature of the restaurant [was] essentially from people who either went there with their families or went there in early evening hours or both, and that, I don't think, rebuts the testimony of the Plaintiffs that later on in the evening the restaurant became a—essentially a place of solicitation.

We hold that the testimony of the landlord's witnesses, particularly Mr. Weinkle, Mr. Ali, and Mr. Wilkinson, provides abundant support for the court's findings that the restaurant was a place where prostitutes would go to solicit customers, and that their activities had a deleterious effect on the business of the hotel. We are bound to uphold these findings, since they are not "plainly wrong or without evidence to support [them]." D.C.Code § 17–305(a) (1981).

The tenant also contends that paragraph 9A of the lease [7] is ambiguous because it does not specifically prohibit soliciting for prostitution in the restaurant, and that the ambiguity must be construed against the landlord. The general rule, however, is that ambiguities in a lease are construed against the drafter, and thus against the landlord only if the landlord is the drafter. *Weaver Brothers, Inc. v. District of Columbia Rental Housing Commission,* 473 A.2d 384, 386 (D.C.1984); *Intercounty Construction Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982); *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* 345 A.2d 456, 462–463 (D.C.1975).

7. Paragraph 9A provides in pertinent part:
   Lessee undertakes to operate the dining room and services to guests of the hotel *at a high standard* as befits the operation of a hotel of the nature operated by the Lessor in Georgetown, Washington, D.C. [Emphasis added.]

Because there was no evidence that the landlord drafted the lease, the tenant is not entitled to the application of this rule.

■ We do not agree, in any event, that paragraph 9A is ambiguous. Whatever may be included within the covenant to operate the restaurant "at a high standard," surely that term means, at a minimum, that the tenant will not allow criminal activity to take place on the premises. Solicitation for prostitution is a crime in the District of Columbia. D.C.Code § 22–2701 (1984 Supp.). It is clear from the testimony of Mr. Dalbashian himself that he knowingly permitted the solicitation of prostitution in the restaurant. He admitted being told about it by the landlord, but he simply chose to ignore it. Referring to the prostitution allegations in the February 10 letter, Mr. Dalbashian said, "That's slander, that letter they wrote me. I sell food, I don't sell people.... I just turned that right over to my attorney, I didn't pay no attention to that letter." At another point in the trial, when asked to comment on the allegations, he replied, "First of all, I'm the chef. I don't stay up in front too much. I'm always in the back. When I'm in back, my wife's on." He continued, "You know, I'm in the back, I don't know what's going on in the front, I'm the chef there. So I don't know what this story is they brought these papers up now. Ever since my wife died all this stuff started happening. See, my wife used to run the front of the restaurant, I run the back of the restaurant, I run the kitchen."

A tenant cannot make his obligations disappear simply by ignoring them, as Mr. Dalbashian did. We hold that the trial court committed no error in finding the tenant in breach of paragraph 9A of the lease.

### III

The court also found that the tenant had violated paragraphs 2A (v) and (vi) of the lease by failing to provide certified statements of its quarterly and annual sales for 1983.[8] The tenant concedes that it did not furnish the statements, but contends that the lease did not require it to do so under the circumstances.

The tenant argues that the sole reason for the requirement in the lease that it provide certified statements of the restaurant's gross sales is to enable the landlord to calculate that portion of the rent which is based on a percentage of the gross sales. Therefore, the tenant concludes, since the landlord had audited Peppino's books and was aware of its gross sales, there was no need for it to certify the sales to the landlord.

■ This argument must fail for two reasons. First, the right of the landlord to audit the tenant's books is separate and distinct from the tenant's duty to provide a certified statement of its gross sales. By conducting an audit, the landlord did not waive its right to have the tenant comply with its obligation to provide the certification.[9] *See Interstate Restaurants, Inc. v. Halsa Corp.,* 309 A.2d 108, 110 (D.C.1973) (covenants in a lease are deemed to be

8. Paragraphs 2A (v) and (vi) provide:
   (v) Percentage rent shall be computed pursuant to Paragraph 2(iii) above, on gross sales, and shall be payable for each calendar quarter on or before the twentieth (20th) day of January, April, July and October of each lease year, for the preceding calendar quarter; and each such payment of percentage rent shall be accompanied by a statement, certified by the Lessee's principal corporate officer, of Lessee's gross sales for the period covered by said installment of percentage rent.
   (vi) On or before the thirty-first (31st) day of January of each year, Lessee shall furnish

Lessor with a statement signed by an officer of Lessee setting forth the gross sales for the preceding lease year. At that time all adjustments required to keep percentage rent on a lease year basis shall be made.

9. In fact, under paragraph 2A(vii) of the lease, the landlord may audit the tenant's books even after the tenant has provided the certified statements, and may charge the tenant for the audit if it results in a disparity of seven percent or more between the landlord's and tenant's figures.

independent unless a contrary intention is expressed in the lease itself). Second, the audit was never completed.[10]

■ The tenant also contends that the landlord waived its right to the certified statements by accepting certain rent payments without the accompanying certification. We need not decide this issue because it was not raised at trial. *Miller v. Avirom,* 127 U.S.App.D.C. 367, 384 F.2d 319 (1967).[11]

Because the tenant concedes its non-compliance and bases its defense entirely on an erroneous construction of the lease, we conclude that the trial court properly found that the tenant had breached paragraphs 2A (v) and (vi) of the lease.

## IV

■ The court found that the tenant had violated the lease by failing to offer proof to the landlord that it carried the requisite insurance. The tenant admits that it never tendered such proof, but contends that the lease does not require it to do so.[12]

The tenant is correct in stating that paragraph 19A of the lease does not expressly require it to offer the landlord proof of its insurance coverage.[13] To determine the meaning of that paragraph, however, we

must attempt to ascertain "what a reasonable person in the position of the parties would have thought the words meant." *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.,* 485 A.2d 199, 206 (D.C.1984) (citations omitted); *accord, e.g., District of Columbia Department of Housing and Community Development v. Pitts,* 370 A.2d 1377, 1380 (D.C.1977). We hold that "a reasonable person ... would have thought" that the provision requires the tenant to offer proof of insurance coverage within a reasonable time after the landlord has made a request for such proof. Otherwise, the landlord might never discover that the leased premises were not properly insured until it was too late and the property had been damaged, causing the landlord to suffer a loss which should have been covered by insurance. *Cf. Brainerd Manufacturing Co. v. Dewey Garden Lanes, Inc.,* 78 A.D.2d 365, 435 N.Y.S.2d 417 (1981) (failure of tenants to insure leased premises exposed landlord to a risk of loss of $175,000 and justified award of possession to the landlord). Thus we conclude that the trial court properly construed the lease and correctly found that the tenant had breached it by never offering proof of its insurance to the landlord.[14]

---

10. On cross-examination at trial, the manager of the hotel testified that the audit had not been completed, but he was not allowed to explain why. On redirect, however, he testified that the tenant had failed to provide certain necessary information.

11. Even if the issue were properly before us, we would find no waiver because the lease contains a "no waiver" clause in paragraph 27. Moreover, it is clear from the February 10 letter that the landlord did not intend to waive its claim. *See Shannon & Luchs Co. v. Tindal,* 415 A.2d 805, 806 (D.C.1980) ("the question of waiver is one of intent which depends upon the totality of the circumstances in each case"); *Kaiser v. Rapley,* 380 A.2d 995, 997 (D.C.1977).

12. The tenant made no objection at trial to the fact that the failure to provide proof of insurance was not mentioned in the complaint, and did not object to the admission of evidence on the issue. We therefore hold that the point was

waived, and we deem the complaint to have been amended to conform to the evidence. *See* Super.Ct.Civ.R. 15(b), made applicable to this case by Super.Ct.L & T R. 2.

13. Paragraph 19A provides:

Lessee will obtain and maintain in full force and effect during the term hereof, or any renewal, general public liability insurance in a minimum amount of $100,-000/$300,000 for any risk created by the restaurant operation, and the Lessor shall be designated as an additional insured on said policies.

14. Mr. Weinkle's testimony supports this finding. Mr. Dalbashian testified that he had the required insurance, but he admitted that he had never shown the policies to the landlord. It would have been a simple matter for the tenant to produce the policies in court to support Mr. Dalbashian's testimony, but this was not done either.

## V

The tenant's final contention is that its breaches of the lease were not sufficient to support the trial court's award of possession to the landlord. There is absolutely no merit to this argument.

Paragraph 27 of the lease gives the landlord the right to take possession of the restaurant premises in the event that the tenant breaches *any* covenant of the lease. It provides in pertinent part:

> Lessee shall fully abide by the terms and conditions herein provided; and in the event of a default of any provision hereof ... which default ... shall not be cured within seven (7) days of written notice by Lessor, which notice shall indicate the nature of any default ... then and in such event, at the sole option of the Lessor, the Lessee's right of possession shall thereupon cease ... and the Lessor shall be entitled to possession of the premises, and may forthwith recover possession thereof by whatever process of law may be available in the jurisdiction in which the premises may be located.....

The landlord seeks a forfeiture of the premises on the basis of this provision. The tenant contends that the trial court erred by straying from the well-founded principle that equity abhors forfeitures.

Appellant correctly observes that when a landlord sues for possession of leased premises because the tenant has failed to make his rental payments, a court may allow the tenant to avoid the forfeiture by paying the rent due before or after a judgment for possession is granted. *Sheets v. Selden,* 74 U.S. (7 Wall.) 416, 19 L.Ed. 166 (1868); *Molyneaux v. Town House, Inc.,* 195 A.2d 744, 746-747 (D.C.

1963); *Trans-Lux Radio City Corp. v. Service Parking Corp.,* 54 A.2d 144, 146 (D.C. 1947). However, when the breach, as in the present case, is not of the duty to pay rent but rather of an obligation collateral to it, such as the duty to operate a restaurant in accordance with the lease, or to certify gross sales, equity will not generally relieve the tenant from forfeiture.[15] *E.g., Interstate Restaurants, Inc. v. Halsa Corp., supra* (failure to operate restaurant during the hours required by the lease); *see also* 49 AM.JUR.2D *Landlord and Tenant* § 1078 (1970); RESTATEMENT (SECOND) OF PROPERTY §§ 12.1, 13.1 (1976).

For the foregoing reasons, we hold that the trial court properly awarded possession of the premises to the landlord.[16] The judgment is accordingly

*Affirmed.*

---

15. Because the tenant in this case never attempted to cure its breaches, we would reach the same result even if the case involved only a failure to pay rent. "[I]f the tenant seeks equity, he must do equity. In other words, a tenant seeking relief from forfeiture must be prepared to square his account with the landlord...." *Molyneaux v. Town House, Inc., supra,* 195 A.2d

at 747; *accord, Smith v. Warren Petroleum Corp.,* 126 A.2d 152, 153 (D.C.1956).

16. Appellant's contention that the trial court failed to make the necessary findings of fact and conclusions of law is frivolous, since the court plainly "stat[ed] the controlling factual and legal grounds of [its] decision." Super.Ct. Civ.R. 52(a).