Linda C. **WHEELER**, et al., Appellants,

v.

William **GOULART**, et al., Appellees.

Nos. 91–442, 91–450.

District of Columbia Court of Appeals.

Argued May 10, 1991.
Decided May 17, 1991.

Patrick J. Carome, with whom A. Douglas Melamed and Ross A. Albert were on the briefs, Washington, D.C., for appellants.

Candida Staempfli Steel, with whom Philip A. Gagner and Lawrence H. Mirel were on the briefs, Washington, D.C., for appellees.

David S. Barr filed a brief, Washington, D.C., for The Newspaper Guild, as amicus curiae.

Lee Levine, Elizabeth C. Koch, Lisa A. Burns, and Jane E. Kirtley, Washington, D.C., were on the brief filed by the Reporters Committee for Freedom of the Press, et al., as amici curiae.

Before STEADMAN and WAGNER, Associate Judges, and KERN, Senior Judge.

PER CURIAM:

This is an expedited appeal from the trial court's order entered during the course of a civil trial now in progress adjudging appellant, a news reporter under subpoena as a witness, in civil contempt for refusing to answer certain questions put to her by counsel for the litigants. Also before us is the consolidated appeal from the trial court's memorandum opinion and order (the "Opinion") entered two days previously which denied the motion to quash the trial subpoena directed to appellant.

We attach a copy of that Opinion as an appendix. There, the trial court succinctly set forth the issue and its ruling: "The issue before the Court on this particular motion is whether Ms. Wheeler may be compelled to testify as to the identity of the person who provided her with information regarding an on-going police department investigation. In short, the answer is yes and the Motion to Quash will be denied." This conclusion of the trial court is supported by the special facts of this case as found by the trial court and the law applicable thereto, and consequently the order of contempt as based upon that conclusion is equally supported.

I.

■ We briefly summarize the facts and procedural posture as set forth in the Opinion. In this regard, we reiterate the oft-stated limited nature of appellate review imposed by statute; namely, that trial court findings of fact are determinative,

unless "plainly wrong or without evidence to support [them]." *Frog, Inc. v. Dutch Inns of America, Inc.,* 488 A.2d 925, 928 (D.C.1985), quoting D.C.Code § 17–305(a) (1981).[1] Appellant is a news reporter who in 1986 wrote several stories published in a local newspaper, which is also an appellant in this case,[2] about a significant police operation then directed at drug trafficking in this city. Once it took place, appellant reported that she had obtained a classified plan for such secret operation before its execution.

Appellant moved to quash a subpoena for trial, asserting that because newsgathering is the essence of a free press she had a constitutional right not to testify concerning her 1986 news story. She cited, *inter alia, Zerilli v. Smith,* 211 U.S.App.D.C. 116, 656 F.2d 705 (1981); *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631, *cert. denied,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974).

The trial court held a pre-trial hearing on appellant's assertion that she was constitutionally privileged not to appear and testify. Testimony under oath was presented at the hearing that before appellant's news stories were published by the newspaper employing her, she had disclosed to two different individuals, in no way connected with her employer, that her source for obtaining the classified information and document detailing the confidential police operation was the then Assistant Chief of Police, Isaac Fulwood.

Fulwood is now the Chief of Police of the Metropolitan Police Department in Washington, D.C., and also one of defendants in the on-going civil action presided over by the trial court. The gravamen of such action is the allegedly tortious conduct on the part of Fulwood and the other defendants subsequent to the 1986 police operation towards the plaintiffs who were among the various high-ranking police officers allegedly responsible for the lack of success of the police operation.

At the hearing on whether the trial court should quash the subpoena, each of the two individuals to whom appellant had made her disclosures in 1986 testified that she told him that she obtained detailed information about the confidential police operation from Chief Fulwood, and one of them testified that she told him that Fulwood had given her a copy of the operation handbook. Neither witness indicated in his testimony that appellant had imposed upon or extracted from him a promise or pledge to keep her disclosure confidential. One witness testified without contradiction that he initiated the call to the reporter and sought and obtained from her the identity of the source of her information. Having resolved all questions of credibility, the trial court found that appellant's disclosures of her sources were not part of her newsgathering or investigative function. The trial court also found that the reporter did not impose upon either of them a stricture to keep what she told them confidential.

The trial court refused to quash the subpoena commanding appellant to appear and testify, and ultimately directed appellant to answer certain questions propounded to her in the trial, on alternative grounds. First, the trial court concluded that appellant could not disclose in 1986 to others the identity of her source and then in 1991, being called as a witness in a court of law, claim the privilege not to identify her source. Second, the trial court applied the balancing test "between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources," as set forth by our sister appellate court in the District of Columbia in *Zerilli v. Smith, supra.* There, the court noted that "[t]he civil litigant's need for the information he seeks [must be]

1. Appellant's objections to certain aspects of the trial court's findings cannot withstand this criterion of review.

2. Since both appellants are represented by the same counsel and their interests treated as identical, we refer for convenience in this opinion to the reporter as the single appellant. We assume without deciding that the newspaper has standing to join in the appeal. We also note that the order to quash is appealable, at least by the reporter, only in relation to the order of contempt. *United States v. Harrod,* 428 A.2d 30 (D.C.1981) (en banc).

of central importance" and "[e]ven when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Id.,* 211 U.S.App.D.C. at 123, 656 F.2d at 713.

In the view of the trial court here, as we interpret it, appellant's testimony that the Chief of Police was her source of obtaining the classified information and document detailing the confidential police operation was "of prime importance" to the plaintiffs' case against the Chief and the other defendants for their alleged wrongful treatment subsequent to the conduct of this less than successful operation in 1986. The trial court also concluded that there was no one other than appellant who could tell where the operation handbook came from or who was the source of the information that she conveyed to the two individuals.

## II.

Appellant forcefully attacks the trial court's ruling. Appellant asserts that the federal court of appeals in this jurisdiction expressly recognized in *Zerilli v. Smith,* supra, 211 U.S.App.D.C. at 122, 656 F.2d at 712, "the preferred position of the First Amendment and the importance of a vigorous press." Appellant also calls our attention to *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), a much-cited judicial decision relating to the task of addressing the competing interests of affording full and fair judicial hearings to litigants and protecting the freedom of the press.

█ This appeal at this point does not present the occasion for a far-reaching examination of the existence and scope of the asserted constitutionally-founded privilege.

As did the trial court, we postulate only for purposes of this appeal such a qualified privilege, as defined in *Zerilli.*[3] Our adjudication upon the facts and circumstances peculiar to this case is that appellant cannot choose to disclose to others in 1986—with no request for confidentiality and under circumstances which did not involve any newsgathering function—that Fulwood was her source for the classified information detailing the confidential police operation, and then choose in 1991—as a witness in a judicial proceeding—not to make this same disclosure. *See Tofani v. State,* 297 Md. 165, 465 A.2d 413 (1983); *Las Vegas Sun v. Eighth Jud. Dist. Ct.,* 104 Nev. 508, 761 P.2d 849, 852–53 (1988); *Pinkard v. Johnson,* 118 F.R.D. 517, 523 (M.D.Ala. 1987). *Cf. Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 597–98 (1st Cir.1980). In short, what she chose to say to others out-of-court she cannot now refuse to repeat in court.

Appellant urges that where "the reporter has previously talked to others outside the courtroom" this court should not adopt what she terms "an automatic, all-or-nothing waiver rule." We do not do so by our decision in the instant case. We base our decision upon the particular facts and circumstances here rather than adopting an "all-or-nothing" rule on waiver. Appellant chose to reveal to others the identity of her source without imposing a stricture of confidentiality upon them in a situation not in pursuit of her investigation. Thus, having disclosed the information unconditionally, appellant cannot follow an "on-and-then-off" practice of maintaining the confidentiality of her source.[4]

Appellant cites several cases for the proposition that the First Amendment newsgatherer's privilege applies even to non-confidential information. However,

---

**3.** We are mindful at the same time that since any such privilege insofar as it flows from the First Amendment operates as an absolute limitation on legislative power to otherwise balance the conflicting interests and since the existence of the privilege lacks any common-law roots, its applicability should be applied with some caution. Close to 30 states have elected to define the privilege through statutory enactments, which can of course expand the privilege beyond any constitutionally defined limits that may otherwise exist.

**4.** We note that the testimony at the hearing held by the trial court of those witnesses to whom appellant disclosed her sources has been widely publicized.

the great majority of those cases involved discovery requests for all of a reporter's notes and source material underlying a given story.[5] That type of broad request is far different from the narrow questions that we hold were properly propounded to appellant under the facts of this case. Once a newspaper reporter discloses the source under the circumstances presented here, the rationale for upholding any qualified privilege ceases. *See Las Vegas Sun v. Eighth Jud. Dist. Ct., supra,* 761 P.2d at 852–53.

Moreover, this appeal does not present the question whether the disclosure eliminates an invocation of the privilege in any and all circumstances.[6] As the trial court rightly observed, the disclosure bears directly upon the application of the postulated two-pronged balancing test.[7] The now non-confidential nature of the testimony sought could quite rightly be taken into account in consideration of the several factors at issue.

Thus, this special factual feature presented here provides significant support to the trial court's application of the two-pronged test. While appellant challenges

the trial court's conclusion as to the importance of her testimony in the context of this case, it is well-established that a trial court determination of the relevancy of proffered evidence, of which this conclusion is simply a variant, is almost always deferred to, *Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990), and we think much the same fact-specific analysis applies to a determination of the availability of alternate sources. In sum, we see no basis for upsetting the trial court's application of the *Zerilli* test here to inquiries with respect to previously disclosed information.[8]

III.

Appellant argues, more generally, that beyond issues of confidentiality of sources, "important First Amendment interests are at stake whenever a reporter is compelled to testify about the newsgathering process." Some thirty questions were propounded to appellant,[9] with respect to which she invoked the privilege and with respect to which the contempt order by its terms applied.[10]

---

5. *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Maughan v. NL Indus.,* 524 F.Supp. 93 (D.D.C.1981); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197 (N.D.Ill.1978). Other cases cited by appellant are based on statutory interpretations which require a different result. *Altemose Constr. Co. v. Building & Constr. Trades Council,* 443 F.Supp. 489, 491 (E.D.Pa. 1977); *People ex rel. Scott v. Silverstein,* 89 Ill. App.3d 1039, 45 Ill.Dec. 341, 344, 412 N.E.2d 692, 695 (1980).

6. Appellant challenges the direct application to "waivers" of the First Amendment privilege of principles of law drawn from other testamentary privileges such as the attorney-client privilege. She argues that the rationales underlying each privilege "differ radically in origin, purpose, and function." However, no such identical interpretation and application of the distinct privileges is needed here. Rather, as discussed, the disclosure here has relevance within the application of the postulated *Zerilli* test itself.

7. The Opinion states: "In engaging in a balancing test courts have recognized that there is a lesser showing of need and materiality where

disclosure of non-confidential material is sought.... Here, Ms. Wheeler disclosed her source to two persons already. This presents a situation where there is a lesser standard to be met by the plaintiffs in seeking to obtain her testimony."

8. We note the standard of review used by the appellate court in *Zerilli* in reviewing a trial court determination that a reporter's privilege prevailed in a discovery context: "[O]ur function on appeal is solely to determine whether the trial court abused its discretion in entering the challenged order." 211 U.S.App.D.C. at 121, 656 F.2d at 710.

9. This questioning took place at a preliminary inquiry conducted outside of the presence of the jury, when appellant appeared in compliance with the subpoena. Questions were propounded by counsel for all parties.

10. Thus, appellant was asked, among other questions, whether she was present at the execution of the police operation, whether she had ever met or talked to various members of the police force, and whether she took a copy of the operation handbook out of her employer's offices.

We deal at this point only with those questions relating to what the trial court defined, already quoted above, as the issue before it in its Opinion, upon which the contempt order was based and to which the prior disclosure related; *viz.*, the source of the information. This was the core upon which the privilege was invoked and argued both in the trial court and on appeal.

Thus, as to those questions asked of appellant in the trial court which are not closely related to the information she has already disclosed, it may be that such disclosure would not preclude her from now invoking an asserted constitutional protection against answering those other questions as intruding without sufficient warrant into the newsgathering process. *See Branzburg v. Hayes, supra,* 408 U.S. at 707, 92 S.Ct. at 2670 ("news gathering is not without its First Amendment protections"). However, this is an expedited appeal from a trial court ruling in the midst of trial. The possibility exists that plaintiffs will not pursue these questions or will frame them in a different manner once they have obtained the testimony from appellant identifying her confidential source, or that appellant will not further invoke the

privilege once this information has been disclosed. Moreover, the trial court in its Opinion was not specifically faced with the application of the privilege to these other questions.[11] Therefore, we apply the traditional appellate approach of restraint in declining to decide that which may not be at issue when appellant resumes the stand.[12]

In sum, we affirm the trial judge's denial of the motion to quash and the subsequent order to appellant to answer in court that which she has already disclosed to two different persons on separate occasions apart from a newsgathering function and without imposing confidentiality upon them, *viz.*, the identity of her source for the classified information detailing the confidential police operation. We also affirm the trial court's sanction for appellant's refusal to answer this question and those questions that are directly related to and closely intertwined with the question to her concerning the identity of her source.[13] With respect to any remaining questions, we vacate the order of contempt without prejudice to its renewal in light of subsequent trial developments.

*So ordered.*[14]

11. Should this need arise, the trial court should, as in its prior Opinion, examine whether the questions relate to matters found to have been waived or are otherwise subject to disclosure after application of the two-prong balancing test. Utilization of an in camera procedure may be appropriate. *See United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).

12. Plaintiffs appear to have no fair grounds to complain about any delay or hinderance that such a course of action may play with respect to the completion of the trial. As far as the record reveals, plaintiffs made no attempt to obtain the deposition of appellant or seek a pretrial resolution of the serious legal issues that are now presented. That there is any interim appeal flows from the fact that the trial court ruled against the application of the privilege and found appellant in contempt, *see United States v. Harrod, supra,* so that appellant, and not the parties to the litigation, is the only participant entitled to immediate appellate review. Had the trial court ruled in favor of the application of the privilege, no review could be sought until the final completion of the trial. D.C.Code § 11–721(a)(1) (1989).

13. Thus, appellant can be compelled to answer the following questions previously propounded by counsel out of the presence of the jury:

Was then Assistant Chief Isaac Fulwood in any way involved in the chain, if there was a chain, of information given to you regarding the raids prior to the execution?

Ms. Wheeler, did you at that time, January of '86 and February of '86, obtain a handbook for Operation Caribbean Cruise from Assistant Chief Fulwood?

Did you tell, between January of 1986 and the execution of the raids, did you tell either—did you tell Captain Hugh Irwin about the source—who the source was for your information?

In January of 1986, Ms. Wheeler, did you tell Sgt. Moyer who gave you that information?

14. The division is prepared to entertain a motion to expedite the issuance of the mandate in this appeal if dictated by the necessities of the ongoing trial.

APPENDIX

SUPERIOR COURT OF THE DISTRICT
OF COLUMBIA

Civil Division

Civil Action No. 89–3563

Civil I

Judge Levie

WILLIAM E. GOULART, et al.

v.

MARION BARRY, et al.

MEMORANDUM OPINION
AND ORDER

This matter is before the Court on a Motion to Quash a Trial Subpoena, brought by the Washington Post and Linda Wheeler, a reporter for the Post. The Court has reviewed the Motion, the additional Memorandum filed on behalf of the movants, Ms. Wheeler and the Post and the Opposition filed by the plaintiffs. The Court heard testimony from Ms. Wheeler, Captain Irwin and Lieutenant Moyer and heard several hours worth of legal argument by all counsel involved. The issue before the Court on this particular motion is whether Ms. Wheeler may be compelled to testify as to the identity of the person who provided her with information regarding an on-going police department investigation. In short, the answer is yes and the Motion to Quash will be denied.

By way of background, this suit arose after the execution of approximately 70 search warrants in connection with a drug investigation which was named Operation Caribbean Cruise. Following the execution of those warrants, a variety of officers previously assigned to the Fourth District Vice Unit were transferred out of their Vice positions and, according to the allegations here, it was only the Caucasian officers associated with Operation Caribbean Cruise who were not returned to Vice positions.

The plaintiffs have filed a complaint alleging violation of their constitutional and civil rights under 42 U.S.C. § 1983 and have further alleged negligent supervision and training and the intentional infliction of emotion distress. The plaintiffs in this case issued a trial subpoena to Ms. Wheeler to learn whether she was provided information regarding Operation Caribbean Cruise, including a copy of the Operational Handbook, prior to the execution of the warrants by then Assistant Chief Isaac Fulwood.

As the facts developed on April 17, 1991 during the hearing on the Motion to Quash, it became clear that Captain Hugh Irwin of the U.S. Park Police is now and as of December 5, 1987 was the husband of Ms. Wheeler, the reporter for the Post. In 1985 then Lieutenant Irwin was one of the U.S. Park Police's representatives involved in Operation Caribbean Cruise. On approximately January 20, 1986 Captain Irwin spoke with Ms. Wheeler and learned that she knew of the large number of warrants to be issued in connection with Operation Caribbean Cruise, that the Operation had targeted the Rastafarian community in Washington, D.C., that the investigation involved large amounts of marijuana and automatic weapons and that the planned date for the execution of the search warrants was in the early morning hours of February 20, 1986.

When he learned this information Captain Irwin was concerned that the press had access to information about Operation Caribbean Cruise and that the availability of such information might pose a danger to the officers who would be executing the warrants in connection with that Operation. At 12:05 p.m. on January 20 Captain Irwin called then Sargeant, now Lieutenant, Moyer who was the Park Police Liaison with Metropolitan Police in relation to Operation Caribbean Cruise and told Lieutenant Moyer that the press had knowledge about the on-going investigation. Although Captain Irwin testified that he did not recall whether he told Lieutenant Moyer who was the source of this information Captain Irwin said that he told Moyer that the source was highly placed and suggested that Lieutenant Moyer check with Linda Wheeler.

Although Captain Irwin did not recall the specific date that he learned from Ms. Wheeler that Assistant Chief Fulwood was

the source of the information given him on January 20, 1986, he did testify that prior to February 22, 1986, the day of the actual operation, he did learn from Ms. Wheeler that Assistant Chief Fulwood had been the source of the information she had related to him on January 20.

At 6:25 p.m. on that same day, January 20, 1986 Lieutenant Moyer called Ms. Wheeler at her office at the Post. According to Lieutenant Moyer, during that conversation Ms. Wheeler attempted to find out information from Lieutenant Moyer about Operation Caribbean Cruise. Lieutenant Moyer testified without contradiction that he did not tell Ms. Wheeler any information concerning Operation Caribbean Cruise.

Instead, Lieutenant Moyer sought to learn from Ms. Wheeler who was the source of her information. Lieutenant Moyer testified last week that he explained to Ms. Wheeler that it was important for him to know whether the source of her information was "on the street", as he put it, or whether it came from someone within the police department. According to Lieutenant Moyer, it was during that conversation on January 20, 1986 that Ms. Wheeler told him her source was Assistant Chief Fulwood.

Between February 16 and February 22, 1986, while in Ms. Wheeler's kitchen, Captain Irwin was shown by Ms. Wheeler a copy of the Operational Handbook for Operation Caribbean Cruise and he was asked by Ms. Wheeler to review the contents of that Handbook. According to Captain Irwin, the Handbook he saw on that day indicated the locations for the execution of the warrants and the identity of the various agents and officers who would be involved in the execution of those warrants. Captain Irwin indicated that upon seeing that Handbook he was surprised because: (1) he had not seen it before, (2) it contained information that he previously was not aware of and (3) it had not yet been given to the officers, like himself, who would be participating in Operation Caribbean Cruise. Indeed, Captain Irwin testi-

fied that he did not get his copy of the Handbook until the early morning of February 22, 1986. Upon comparison with the Handbook he had seen in Ms. Wheeler's kitchen several days earlier, Captain Irwin testified that the Handbook he got on the morning hours of February 22 was substantially the same as that he had seen in Ms. Wheeler's kitchen. There was some updated and additional information, but otherwise, in his words, the contents were substantially the same.

At the time Captain Irwin reviewed the Handbook in Ms. Wheeler's kitchen, Ms. Wheeler told him that Isaac Fulwood had given her the Handbook.

According to Captain Irwin, his relationship with Ms. Wheeler in early 1986 was one in which they confided with one another. In response to leading questions posed to Captain Irwin by Ms. Wheeler's counsel, Captain Irwin testified that he thought that Ms. Wheeler believed that he (Captain Irwin) would not divulge the substance of their conversations. Further, Captain Irwin testified that he believed his conversations with Ms. Wheeler were consistent with her attempt to investigate and corroborate information given her as a reporter.

The Court does not place much weight on these last comments by Captain Irwin in response to the questions posed to him by Ms. Wheeler's counsel for several reasons. First, it is clear that what Captain Irwin testified to in response to the questions posed by Mr. Carome, counsel for movants, was only what Captain Irwin assumed Ms. Wheeler was thinking. Captain Irwin gave no testimony in Court as to anything Ms. Wheeler said to him about any expectation she had or about any reason she had for supposedly trying to get information from him by way of investigating or further corroborating information already known to her. Moreover, there is no testimony from Ms. Wheeler that she had any such expectations of confidentiality in her conversation with Captain Irwin. But, for reasons that will be stated later, that is not dispositive one way or the other. On the record that was presented to the Court it was clear that Ms. Wheeler provided the

information to Captain Irwin with no expectation of confidentiality nor pursuant to any investigative activities in which she was engaged or for the purpose of corroborating information that she already had gotten from other sources. The testimony presented to the Court, which is the record upon which the Court must base its findings, indicated that Ms. Wheeler asked and sought nothing in return from Captain Irwin. Regardless of any comments to Captain Irwin, it is equally clear that she got nothing from Lieutenant Moyer but very freely gave out information to Lieutenant Moyer.

With respect to Ms. Wheeler's testimony on April 17, 1991, she testified: she had no recollection of a January 22 conversation with Captain Irwin, she had no recollection of any January 22 conversation with Lieutenant Moyer and she had no recollection of any events on or about February 16 or 17, 1986, in connection with the Handbook. Ms. Wheeler testified that, if she were ordered by the Court to testify, such questions would probe her newsgathering activities and would have, in her words, a "devastating effect" that "it would be the worst thing [she] could think of". According to Ms. Wheeler, if she were required to testify both her credibility and the trustworthiness of other reporters would be affected adversely.

On the issue of credibility, the Court had the opportunity to listen to Ms. Wheeler, Captain Irwin and Lieutenant Moyer on both direct and cross-examination by several counsel. The Court also had the opportunity to listen to what each person said and to compare that testimony with other evidence presented. The Court observed the demeanor of the various witnesses. Based upon those evaluations, the Court finds that Lieutenant Moyer's testimony was credible and that Captain Irwin's testimony was the most credible of the persons who testified. For it was Captain Irwin, who testifying under oath, had the most to lose by being candid and truthful.

The Court does not accept Ms. Wheeler's testimony that she had no recollection of the various conversations. The information that is at issue here involved advance knowledge of an on-going police investigation of far reaching dimensions, considering the number of targets and search warrants that were to be issued. Indeed, the day after the Operation and four days after that Ms. Wheeler herself wrote or co-authored two articles in the Washington Post which referred to the fact that the Post had a copy of the Operational Handbook in advance of the Operation. In effect, based on the evidence presented to the Court Ms. Wheeler put herself in the position in which she finds herself today both by the reference in the article to the advance receipt of the Handbook and by choosing to talk about her source to Captain Irwin and Lieutenant Moyer.

There are three questions which are presented to the Court as a result of this particular motion. The first is whether or not there is a reporter's privilege here in the District of Columbia in the absence of a statute. To that the Court answers probably yes. It is the Court of Appeals, however, which will make the final decision in that regard. Second, if such a qualified privilege does exist, did Ms. Wheeler waive it? That question also must be answered in the affirmative. Finally, and independent of the question of waiver, is the question of whether application of a court developed balancing test requires Ms. Wheeler to testify. That question also must be answered in the affirmative.

With respect to the existence of a reporter's privilege, many states have adopted statutes which codify such privilege. In other states and in other federal jurisdictions, there being no federal statute in this regard, courts have found a qualified privilege for reporters. See *Branzburg v. Hayes*, 408 U.S. 665 [92 S.Ct. 2646, 33 L.Ed.2d 626] (1972); *Zerilli v. Smith*, 211 U.S.App.D.C. 116, 656 F.2d 705 (1981). That privilege is a recognition that a free press has an important role as a source of public information. *See Zerilli, supra*, 656 F.2d at 710–711. But that privilege involves "a balance between freedom of the press and the obligation of all citizens to given relevant testimony...." *Branz-*

*burg, supra,* 408 U.S. at 710 [92 S.Ct. at 2671] (Powell, J. concurring).

In the District of Columbia there is no such reporter's privilege statute, often referred to as a shield statute. Upon review of the caselaw, however, the Court would anticipate that our Court of Appeals might well find some form of qualified privilege to be applicable here in the District of Columbia. If the Court is wrong about how the Court of Appeals might decide the issue, then all the other questions presented before the Court are moot. If there is no privilege, Ms. Wheeler must testify and there is no need to reach the other questions. For the sake of a full record the Court will assume that our Court of Appeals will find such a privilege.

Assuming a qualified privilege does exist, the question is whether it has been waived. There is a long line of cases which recognize that a reporter has the ability to waive a reporter's privilege. *United States v. Cuthbertson,* 630 F.2d 139, 147 (3rd Cir.1980); *Tofani v. State,* 297 Md. 165, 465 A.2d 413 (1983); *Altemose Construction Company v. Building and Construction Trades Council of Philadelphia,* 443 F.Supp. 489, 491 (E.D.Pa.1977); *Pinkard v. Johnson,* 118 F.R.D. 517, 523 (M.D. Ala.1978 [1987]) and *Las Vegas Sun Incorporated v. Eighth Judicial District Court,* [104 Nev. 508], 761 P.2d 849 (Nev. 1988).

In *Las Vegas Sun,* the Supreme Court of Nevada stated "the disclosure of a source and the attribution of remarks to that source is a clear cut waiver of the shield privilege … [w]hen a newspaper or broadcaster names its sources and quotes statements made by that source the underlying purpose of the shield law is vitiated and the statutory privilege is waived." *Id.* [761 P.2d] at 852–53. The Supreme Court of Nevada also noted that, even in the absence of a statute, the privilege could be waived, referring to *Tofani. Id.* [761 P.2d] at 852.

Here, on the facts presented, the Court finds that Ms. Wheeler told Captain Irwin and Lieutenant Moyer the name of her source. No one forced her to tell the name of her source. It was a voluntary, conscious act for which, on this record, she got nothing in return. The record before the Court belies any characterization that Ms. Wheeler's disclosure was a part of a reporter's "give and take" in the course of gathering news. Here, Ms. Wheeler gave, but took nothing.

In arguing against waiver Ms. Wheeler's attorneys have stressed that this is not like the attorney-client privilege or other privileges designed to protect confidential information, because the reporter's privilege, according to Ms. Wheeler's counsel, protects non-confidential as well as confidential information. While this distinction between confidential and non-confidential information may have a bearing in connection with the balancing test as to whether a reporter can be ordered to disclose information, it does not have any role in determining whether or not there has been a waiver of any privilege.

In support of their argument that the reporter's privilege is unlike the attorney-client or informant privilege the movants have relied upon the only case they found—*People v. Silverstein* [89 Ill.App.3d 1039, 45 Ill.Dec. 341] 412 N.E.2d 692 (Ill. App.Ct.1980). There the Court was relying upon a statute. Having review that case and the statute upon which it was based, this Court does not find that the distinction made by that court to be convincing.

Rather, the Court relies and follows other cases which have noted the similarity between a reporter's privilege and the attorney-client and informant privilege. *See, Continental Cablevision v. Storer Broadcasting,* 583 F.Supp. 427, 433 (E.D.Mo. 1984); *Anderson v. Nixon,* 444 F.Supp. 1195, 1200 (D.D.C.1978). Both the attorney-client and the informant privilege are inextricably tied to the free flow of information. As with the reporter's privilege, it is the ability to prevent disclosure that is the underpinning of those two privileges. In the attorney-client privilege, the client must know that the attorney will protect the information given by the client in order for the attorney to act effectively and for

the client to feel that the client can pass to the attorney all information necessary for the attorney to do his or her job. With respect to the informant's privilege, the importance of protecting the identity of informants is an absolute prerequisite to effective law enforcement. Indiscriminate disclosure of informants' identities would severely hamper law enforcement techniques and operations. Nevertheless, the courts have found that such privileges can be waived and disclosure can be ordered.

In *Pinkard* the Court did recognize a waiver in that case where the disclosure was from a reporter to a litigant. The Court does not find any conceptual distinction between that situation and here, where the information was given to another person but one who is not litigant. The point is that the information was disclosed.

With respect to cases where sources had disclosed their own identity and then courts refused to order the reporter to disclose the identity of that source, the Court has concerns that such cases carry the privilege too far because such cases appear to be inconsistent with the very rationale which courts have espoused as the underpinnings of the reporter's privilege.

Ms. Wheeler's counsel in evaluating these facts would go so far as to argue that there would be no waiver here or in any situation. For example, if Ms. Wheeler were sitting around at a dinner party and tells several of her closest friends the identity of her source, there would be no waiver. The privilege should not be read in such a broad manner. The courts have always viewed it as a qualified, as opposed to absolute, privilege which reflects a balance between the freedom of the press and the duty to reveal relevant information. In effect the reporter's privilege represents a balancing of competing societal interest.

While the privilege confers a benefit, that is the right not to be forced to disclose information, the privilege carries with it simultaneous responsibility. That responsibility is not to voluntarily disclose your sources, regardless of whether the information given to the reporter was from a confidential or non-confidential source. If a reporter wishes to avail him or herself of the non-disclosure benefits of the privilege, he or she cannot at the same time selectively breach that privilege. When Ms. Wheeler voluntarily told Captain Irwin and Lieutenant Moyer that Assistant Chief Fulwood was her source, she knowingly and intelligently waived her right to invoke any reporter's privilege. Whether Ms. Wheeler's motives in passing on that information were romantic or, as her own attorney characterized it as "pillow talk", or a concern for the safety of law enforcement officers or any other reason is not important and does not change the result. If Ms. Wheeler wanted confirmation of the information she had received, she did not have to name her source to get it. She chose to name her source to two separate people and cannot now wrap around herself the reporter's privilege to prevent being compelled to come to court and tell in a courtroom that which she so freely chose to tell others outside the courtroom.

With respect to the final issue presented to the Court—the balancing test, Ms. Wheeler and the Washington Post assert that the privilege can be overcome only if the plaintiffs show: "(1) that the information goes to the heart of plaintiffs' legal claims and that (2) plaintiffs have exhausted alternative avenues for obtaining the information in question." (Memorandum Regarding the Hearing Concerning Motion to Quash at 6 and 7).

With respect to the first issue, the plaintiffs have argued that if Chief Fulwood leaked the information and the Handbook, that that goes directly to the plaintiffs' claim of discriminatory treatment and due process violations. Such leaks would explain Chief Fulwood's motivations and actions, which differ in great respect, according to plaintiffs, from his public explanations. Secondly, Ms. Wheeler's information would act directly to impeach Chief Fulwood's deposition testimony that he gave the Handbook to no one including Ms. Wheeler.

This case is as classic a "one-on-one match up" as any case to be presented in

this Courthouse. While there are multiple plaintiffs and multiple defendants, the testimony of Chief Fulwood will be a critical factor in how this case is ultimately decided on the merits. If the jury believes Chief Fulwood it will do much to enhance the strength of the defendants' arguments. On the other hand, if the jury chooses to disbelieve Chief Fulwood it will do much to enhance the plaintiffs' position in this case. In these circumstances the matters bearing on the testimony of Chief Fulwood is of prime importance to be presented to the jury in this case. *See NLRB v. Mortensen,* 701 F.Supp. 244 (D.D.C.1988).

In engaging in a balancing test courts have recognized that there is a lesser showing of need and materiality where disclosure of non-confidential material is sought. *See Continental Cablevision v. Storer Broadcasting,* 583 F.Supp. 427 (E.D.Mo. 1984); *Miller v. Mecklenburg County,* 602 F.Supp. 675 (W.D.N.C.1985). Here, Ms. Wheeler disclosed her source to two persons already. This presents a situation where there is a lesser standard to be met by the plaintiffs in seeking to obtain her testimony.

The second prong of the balancing test requires exhaustion of alternative sources. The facts presented to me in the context of this hearing indicate that, although multiple copies of the Handbook were prepared prior to February 22, 1986, only two of those copies were outside a locked safe. One was given to then-Chief Turner and the other to then-Assistant Chief Fulwood. As noted, Chief Fulwood has denied under oath that he gave that Operational Handbook to Ms. Wheeler or anyone else prior to February 22. There is no one else other than Ms. Wheeler who can tell where that Operational Handbook came from or who was the source for the information that was given to Lieutenant Moyer and Captain Irwin on January 20.

This is a situation more like the *Mortensen* case, than *Maughan v. NL Industries,* 524 F.Supp. 93 (D.D.C.1981). Indeed, in *Maughan* Judge Joyce Hens Green did note that, although her case involved an attempt to get disclosure of reporter's notes, the reporter could be called to testify. On the facts of this case with the extremely limited universe of persons involved with the operative facts, *i.e.,* Assistant Chief Fulwood and Ms. Wheeler, it is those two people who should be called to testify. One has testified and denied it. And the Court finds on these facts that the plaintiffs have exhausted their alternative sources and further that the first prong of the balancing test tips in favor of the plaintiffs in this regard.

For all these reasons, the Motion to Quash Subpoena filed by Ms. Wheeler and the Washington Post will be denied.

> Richard A. Levie
> RICHARD A. LEVIE
> Associate Judge
> Signed in Chambers